...before writing it. I don't think he was talking business. Tell me about the score. I don't know. I'm writing it patiently. I'm glad you're waiting, Robert. I'm always ready to see how things are going. Well, there's something off-steer I've got with the score, I guess. Okay, Mr. Rountree, you're representing Mr. Lyles, right? I am, Your Honor. Okay. When summary judgment was rendered against Mr. Lyles, we knew only that the Atlantis plate that was installed in his neck failed within two hours after surgery. It seemed logical that it was a defective plate. Is that an indisputed fact there? Yes. Undisputed? Yes, I believe it is. Their expert agreed with it, our expert. Within two hours? Within two hours, yes, Your Honor. Possibly much sooner than that. It seemed quite logical that the reason for that was a defective plate. Their own expert testified that the surgery was prepared as he would have done it, that it was performed as he would have done it, and the post-operative care was certainly standard. So it was very logical to assume that this plate that failed so soon was defective. Dr. Matthews, their expert's testimony would probably have been very different if Medtronic had not concealed information from us about the Vertostat and Progenix products. He was not grilled on that. He was the chief medical officer when warnings were made about the misuse of these products. The Vertostat device is not supposed to go in the neck. It's not supposed to be used with the Atlantis plate to stabilize it. Their literature says, and this is something that we did not know until we got an anonymous call, their literature says that the Vertostat is not sufficiently strong to support the spine without additional instrumentation. Now you say their literature supports it. What are we talking about? Is this a pamphlet that's available to the public or to the doctors? It is a surgical guide. It's not easily available to the public, that's for sure. It is given to doctors. Somebody just called you and said, hey, you might want to know this. Isn't it amazing? Isn't it amazing? Someone called Mr. Renison in May of this year, well, last year, and said he worked for Medtronic and Medtronic had not revealed information that was important to the case. So it's right out of John Bush. It's an amazing situation I haven't seen in my 40-plus years of practice. But it would have been good if they had called earlier. What? It would have been good if they had called earlier. It would have been better if they had called earlier. Yes, it would have been better if Medtronic hadn't concealed information as well. They're going to say, and they have said frequently, that Dr. Sin, who inserted these products in Mr. Lyle's neck, was exercising his independent medical judgment, the practice of medicine defense. We know that's not true because Dr. Sin, in answers to discovery, said that these devices were used in their ordinary and customary fashion. Did Medtronic provide the warnings to Dr. Sin that it has been publishing for years? If it did not do so. Is that an unanswered question? That is an unanswered question. It is somewhat rhetorical. If they didn't do so, it's a failure to warn case. It could be an unfair trade practice case, a deceptive trade practice case. Inevitably, this is your court, this court, 1978 in the Rozier case, by far the most important case here, information developed in the discovery stages of the case influences, our influence there, the decision as to which theories would be emphasized later on. So we only emphasize the one theory that made sense at that time, which was res ipsa. We now know there's probably something else, the incompatibility of these products. We asked Medtronic to identify its products used in Mr. Lyle's surgery. It identified three anatomics with a number, some screws and some other products. It did not identify the vertistat spinal system. I referred to this in my original brief as a pattern of deception. It has not said, it would not say what the product was. In its brief, it doesn't say the vertistat or a vertistat. It simply says vertistat. It was only last week with the request for judicial notice that we finally know that this is part of a vertistat spinal system. This court in Rozier said, it is axiomatic that discovery by interrogatory requires candor in responding. That case was cited by another Georgia case. It was a Georgia case before the split. It said, moreover, an interrogatory must, to the extent that it is not objected to, be answered fully in writing under oath, citing Rule 33, and the answer must be true, explicit, responsive, complete, and candid. Okay, now, it's important for you to tell us exactly which interrogatory the response was not forthcoming on. The interrogatory was, please identify all the products. What number is it? What number? Interrogatories that have numbers on it? There were so few. Okay, well, go ahead. I'm sorry. Go ahead. Just tell me what the interrogatory was. Sir? Just state what it was. State what the question was. They were asked to identify all of their products used in Mr. Lyle's surgery. Okay. Did you have something? I had a question. Assuming that everything you say is true, what is it that you want us to do, and how do we do it? What's the vehicle? I assume you're going to tell us it should go back to the trial court or something. Absolutely. But what is the vehicle by which we would do that? You reverse the district court's dialogue of the motion for new trial. You could, you know, the motion for summary judgment is also an appeal. That warrant reversal. But on what basis do we reverse it? You've got to give us a legal basis that we can do either one of those things. Because there was no evidence in the summary judgment record of anything other than a defective plate. The moving party, contrary to the law, was given the benefit of all inferences. They were drawn in its favor and not in favor of the nonmoving party, as the law requires. My misunderstanding about this, or my understanding, I don't know which it is, is that they failed to advise you of a pamphlet. Sir? They failed to advise you of the existence of literature that advised not to use this particular device in this surgical procedure. That's correct. And they withheld that. That's correct. That's your argument. Yes, sir. That's on this appeal. There are two appeals pending. Which are out where? We're on the 60B appeal. The other appeal was not, there was no oral argument. Okay. Go ahead. I'll ask a question later. We also asked for the production of documents. We asked for the production of documents, all documents relating to Medtronic products used in Mr. Lyle's surgery. The question is, there were three complaints filed. When the interrogatories were filed, you were traveling on the original complaint, as I understand it. And when the interrogatories were answered, the operative document was the second or third amended complaint. Third amended, yes. How did the, because of somewhat the confusion as to what the question was because of how your case developed, do you have any evidence of anything that shows it was an intentional misstatement, or rather just they were working off of the third amended complaint as opposed to the first amended complaint, and the interrogatories that were originally filed? That would not change the meaning of all. That wouldn't change the discovery that was actually served in May and not answered until September 30. But hadn't your complaint been honed to the two devices, the two things that you, the plates and the progenics? That was certainly the focus in July because that's all we knew about at that time when the third amended complaint was filed. That was well before the answers to discovery. And certainly that did not in any way suggest that the scope of discovery was limited to the things that we knew about at that time, or subsequently for that matter. We asked for production of all documents. And this is, and I'm sorry I missed a point that you just raised. It doesn't have to be intentional. It obviously was intentional in this case. But it doesn't have to be because Rule 60b-3 says fraud, misrepresentation, or other misconduct. And this Court has made clear that fraud and misrepresentation are not essential to the meaning of misconduct. But this is what Mr. Hayes said. What is the other misconduct? Sir? If it's not fraud or in the sense of deliberately withholding evidence that was asked for in an interrogatory, what is the other, quote, other misconduct? It could be, it's not meaningful here, but it could be an unintentional misstatement. Okay. Well, I mean, I want only what's meaningful here. All right. In any event, when Mr. Hayes was arguing to the District Court, he said, I want to point out first that the response to discovery did not deny the existence of documents pertaining to infuse or pertaining to vertistat or pertaining to progenics. It simply did not produce anything with respect to those products. That, I submit, is misconduct by itself. Okay. I'm sorry to get you back to what is the, so it seems like you answered my question before you started talking again about the misconduct, that just because you've got res ipsa loquitur, it was summary judgment was inappropriate. So that's your vehicle to get your summary judgment reversed if indeed we should, if you were correct and we believe res ipsa was okay on this theory. But you're actually arguing that you should have been given your rule 60 motion should have been granted because there was misconduct and that that's a basis for overturning. Right? That's your vehicle. And that's really the vehicle. You're talking more about that than the res ipsa. Sure. That's the case that you granted oral argument in. I wanted to say that we may, if we had the benefit, if you let us go back to the District Court and we had the benefit of the information that was concealed from us, we might end up concluding that it was in fact a defective plate. The problem is we haven't had a chance to explore other possibilities that are quite logical when you consider the incompatibility of these products. You said in Rozier that our system of civil litigation cannot function if parties in violation of court orders suppress information called for in discovery. There was no order in this case because we didn't know that they were concealing this evidence. Contrary to what Medtronic says in its brief, the production was not, non-production was not obvious. Page 7 and 8. Further, it was obvious to Lyles and his counsel that documents concerning Virtostack and Progenix had not been produced. Page 11. MSD did not produce documents related to Virtostack and Progenix and it was obvious. Page 22. On September 22, 2015, MSD responded to Lyles' written discovery. It did not produce documents related to Virtostack or Progenix. It did not object to the discovery with respect to those products. The non-production was obvious and, I will add, intentional. Okay. Well, I think we granted oral argument in both of these consolidated cases. But anyway, but I have a question about assuming arguendo that Lyles can sufficiently show that we can infer a defect through res ipsa loquitur, doesn't there also have to be some evidence in the record before the district court that the product was defective when it left the manufacturer's control? And is this evidence in the record? I don't believe it is. And why don't you have to show that at the time to overcome summary judgment, and that even if res ipsa theoretically is an okay theory, you don't, you haven't established it? That's what res ipsa is. It is the absence of any other logical, the absence of evidence of any other logical inference. But we don't know when the defect occurred. No, we don't. So it could occur in the surgery room. I mean, somebody could drop it or something. I mean, we don't know. And you have to exclude all the other possibilities, don't you? Well, could we focus on 60? Okay. Okay, that's fine. Now, Moser recited in the Third Circuit case Aberbach v. Rival Manufacturing for the proposition that discovery cannot serve the function of triggering subsequent inquiry if parties were not entitled to rely on the results obtained in each step. We relied on the failure to object and the failure to produce. In this Court, this Court said in McLeod, Alexander v. Quarles, you must have a valid objection not to produce documents. In their brief here, they say if they thought that all meant 100 percent rather than 50 percent, they would have objected. In the district court, they said with respect to each product, there are product inserts. Had he asked for it, had I understood he was asking for it, he would have gotten it. I think there's a grain of truth when they say that they would have objected if that was the worst and most dishonest statement in their argument. I'm sorry. Okay, you can finish that statement, but just finish that quickly. It's the attempt to portray a dispute over Enfuse and the Atlantis Plate as a dispute over progenics and the Virtus Act. You certainly saved some time for rebuttal, Mr. Autry. Not for me. Yeah, but that's for Ennison. Mr. Levin, we'll hear from you. Good morning, Your Honors. May it please the Court. My name is Murray Levin, and I represent the Defendant and Appealee Medtronic. Judge James made two rulings which are on appeal before Your Honors. Number one, he granted summary judgment. And here your appeal, your review, is de novo. But I would like to ask Your Honors to keep in mind that in ruling on a summary judgment in a bench trial, a district court has somewhat greater discretion to consider what weight it will accord to the evidence. That's the placid oil standard. In ruling number two, Judge James denied the Rule 60b-2 and 60b-3 motions, and here your review is for an abuse of discretion. I submit that both rulings were correct and should be affirmed. As the Court knows, more than four years ago, back in 2013, Mr. Liles had an anterior cervical fusion surgery, and during that surgery there were several Medtronic products used. The vertebral body replacement device, which is VertiStack, the bone graft material, which is Progenix, and the Atlantis translational plate. To this very day, the device, both devices and the graft remain in place. During the pendency of the litigation, Mr. Liles, whose counsel had the benefit of a board-certified orthopedic surgeon expert, filed a complaint and then three amended complaints. All of them. What I'm interested in is the Rule 60 aspect and how do you respond to his charge that you deliberately and intentionally withheld relevant and, indeed, from his point of view, crucial information about this device. That's what I'm interested in. I think Judge James made a number of key findings after a lengthy hearing and voluminous briefing, and I'd like to just read those to the Court. He said that Liles' actions following receipt of Medtronic's September 25th team discovery does not constitute due diligence. I might point out that while the discovery- What I'm interested in is primarily- I can determine due diligence well enough, but what I'm interested in is your response to the fact that you intentionally or deliberately withheld relevant information in what it looks like on the surface. There was a very broad interrogatory, but you didn't object to the breadth of the interrogatory. We did not, Your Honor. And the answer that you gave was not complete and omitted what they claim is information that would change the contours of the case. May I draw Your Honor's attention to the record of page 1248 and 1249? These are the interrogatories and document requests that are in dispute. The key interrogatory is asking us to give a list of all the products. It's interrogatory number two. It's found on page 1248 of the Record on Review, and it says, Identify any and all devices or products manufactured or sold by Medtronic which were used in Bryant-Liles. The answer is that Medtronic devices used in Bryant-Liles are identified in the records of LSU University Hospital Shreveport, the hospital which the plaintiff underwent surgery. Attached is page 30 of the hospital records, which is the implant record, which does record each of the three matters that were utilized. It has the progenics. It has the VertiStack, which it calls an implant, and a strut, which is another name for VertiStack. And it also has the Atlantis plate. So they are there. The other contested discovery is the request for production, which is mistakenly called five because there's already a five. Four asks for recall notices about Infuse. Five asks for recall notices about the Atlantis plate. And five number two says all information retained by Medtronic concerning the medical devices implanted in Bryant-Liles. Rightly or wrongly, but certainly not intentionally, because there was nothing whatsoever to hide, we answered only about Atlantis. Through a complaint and three amended complaints, through two expert depositions, and through the depositions of both treating doctors, nothing was ever asked about any other product. What was this literature? Pardon me? What is the literature that he is claiming that you withheld from him? We didn't withhold anything on purpose. He did not produce a package insert for VertiStack. And did it say that this device was not appropriate for the surgery that was performed? What it said is it is not. Did it or did it not say that? Yes or no or yes and no or what? Yes, it said that. The exact wording is it is not intended for use in the cervical spine. Okay, and why is that not crucial to his case? Because it's used in the cervical spine routinely by every doctor. Even though you say it's not intended for use? As we pointed out. Is that correct, what I said? I tried to give a verbatim quotation from the package insert. It says it is not intended. And the reason that it is not intended is a question of size. Now, each of the doctors, both experts and both treating doctors, were specifically asked what is the status of the VertiStack cage? And each one said it's fine, it's performing, it's in place, and it's there to this day. It has nothing to do with this. This is a complete after the fact. I understand that. But I'm just saying the answers you've given me so far indicate that he is correct. He is correct that we did not produce a document that concerns the VertiStack cage. And the surgery that the gentleman has had. Pardon me? And the exact surgery that the gentleman has had. The VertiStack cage, though this is not in the record, is used routinely for use in the cervical spine. But shouldn't the experts have had a chance to talk about whether it was proper to use it in this gentleman's surgery? I mean, they had these experts, and they may have said it was still there, but they never opined as to whether it was properly done and whether it's supportive enough given the size and all of the surrounding things that the experts could have tried to make hay with. Well, Your Honor, let me try to answer your question by posing a question. If I'm consulting with an outside expert. I don't have to answer questions. Pardon me? I said I don't have to answer questions. I'm posing a question. No, go ahead. If the board-certified expert who is consulting with Plano's attorney thought there was any issue with that, this was a non-factor. We didn't say, oh, there's a problem here, let's withhold it. We're not even aware of it. So, okay, he says he found something on the Internet and an anonymous caller told him about it, and now he goes on the Internet and finds this, and he shows it to us. We don't dispute it. It's all beyond what was in front of the judge at the time. There was no effort at any time by the plaintiff to follow up. I gave the plaintiff on May 25th an expert report that I had prepared at the very outset of the case, and it talks about VirtaStack over and over again, about five or six times. It wasn't anything we were hiding. It's not involved. Okay, let me ask you this question. That is, to what extent was Medtronic's representatives responsible for the use of this device, or was it solely the decision of the surgeon? I would say it's solely the decision. I don't know what you would say. Either you know or you don't know. There's no evidence in the record that Medtronic was at the surgery or had anything to do with the surgery. If you look in the record, there's a list of everyone who was present. So you're saying you're representing to me, as best you know, that Medtronic never suggested, recommended, or sold this device in this particular case for the known purpose of what it was used for. That's exactly right, Your Honor. Did I understand you correctly to say that the VirtaStack has subsequently been approved for use in the cervical spine? Yes. At the time, not subsequently, actually before. In 2011, there was a VirtaStack that was specifically cleared. The FDA does not approve. It cleared it for marketing. And I do want to call the Court's attention to 21 U.S.C. 396, which I think is important because the FDA does not regulate use. Not merely. It says whether a product can or cannot be legally on the market. And the citation, which is on page 28 of our brief, says, Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship. For all that is in the record, that's exactly what happened. This doctor used his independent medical judgment to say this product is the best product for this patient. And, in fact, according to the record and the testimony. And you supplied it. Pardon me? And on the basis of the doctor's request for the device, you supplied it. You knowingly supplied this device for this particular surgery. No, Your Honor, that's not the way it works. The way it works is that devices are stocked in the hospital in a storeroom. We don't have any information as to when this particular device came. We don't know what happened to it in the hospital. It has to be sterilized by the hospital. Someone on the hospital staff, it's normally the circulator nurse or the scrub nurse, gets it and brings it into the operating room. We have nothing to do with the choice or with the transference of the product into the OR. Okay. Well, you say the doctor exercised independent medical judgment to use this product, even though he knew that it was not indicated for this use. But the doctor, I thought he said that he did not exercise this. He said it was contraindicated for use in the cervical spine. He didn't say that. He didn't say that in answers from his ñ well, it's cited in Dr. Sinn's discovery response to interrogatory number 6, which is cited in opposing counsel's brief. It doesn't say that. So it doesn't say that. No, it doesn't. So that's false in the brief of the opposing party. Yes, it is, Your Honor. That he never said that he did not realize that the device was contraindicated. He said he used it in the way ñ it is a very terse answer in an interrogatory answer. And what he said was, I used it in the customary and regular way that it's always used, which is true. At the time ñ So did anybody ask him if he knew it was contraindicated? No, of course not. That's ñ the record is silent. This is all after the fact. If they'd have asked him, then we might know whether he used his independent medical judgment. No, let me just make this clear. Every product that is cleared or approved by the FDA must be accompanied by a package insert, which sets forth indications and contraindications. This product, when it went to LSU at Shreveport, had such a document. The record is silent as to whether or not the doctor read it. But judging by what he said in another part of the dispute, which is not here before you, as to whether or not he used Infuse, he said he had read the package insert and he knew that it wasn't supposed to be used in the cervical spine, so he didn't use it. I am confident that he would say the same thing, that he had read the package insert, but he made a choice because there was a very long ñ You don't know. You're just speculating because we don't know. Because he read some other packet, and they don't know either. But it doesn't call for going back before the ñ it doesn't call for a revisiting of this by Judge James. If we look at the summary judgment record before Judge James, it is bereft of any support for any defect. At the last minute they came up then with res ipsa loquitur, but they have failed completely to meet the standard where they have to sufficiently exclude evidence because at the same time I did ask for two things to be brought up before Your Honor, and I don't know if they are there from the clerk. One, I marked it 1 and 2. One is the complaint of Bryant-Liles to the medical review panel, and I've highlighted the last sentence, which it is averred that LSU and Dr. Sin's treatment of Mr. Liles fell before the standard of care by improperly installing a medical device and by improperly monitoring the patient following the installation of the device. This is certainly not eliminating other possible causes. It's stating other possible causes. And in addition, in the second document which I've given you, which is an excerpt from the deposition of the plaintiff's own expert, Dr. Stringer, I'm looking at what is page 87 or page 983 of the Record on Appeal, lines 11 through 16, questioned by Mr. Liles' attorney to Mr. Liles' expert, do you have any reason, other than user error, why that device could possibly have broken? Answer, no, just based on the information the answer is no. So rather than eliminate, what we see here is they're actually keeping open the case against the doctor for using it incorrectly. I don't believe there's any reason to send this back. Judge James looked at the Ray Sipser record and found there was nothing there. When you move over to the Rule 60B, 2, and 3, I think you will find there's no due diligence, there's no showing whatsoever in the record, and this is very important, that this supposedly newly discovered evidence would have changed the outcome. And I say that because I'm confident that if you search the record from top to bottom, there's never any criticism whatsoever in the medical record by any of the doctors, at the two treating doctors' depositions and at the two experts, no statement whatsoever that the VirtaStack or Progenix had anything to do with either an injury or contributing to the problem with the plate. What is your expert's theory on why it did not function within two hours of the surgery? Because of any number of things that are in the record. It may have been contoured or notched. You have to do that to put it in. It may be that he hyperextended his head when they were transferring him. You can search the record. There are no witnesses presented. There's nothing in there that shows where was he from the time he was moved onto the gurney to the time he's taken to the... But they said that the nurse did not make any notations that he stretched in a weird way or something that would have caused this. They didn't call any witness to say, okay, I was with him. I took him. Here's the two hours that we're looking at. Here's what happened to him. He looks at one line in the record, which if you look at it, it just says that he's in stable condition. He's breathing. His heart's okay. It says nothing about the status of the plate. I have another question for you from the opposing counsel's reply brief. Sure. The opposing counsel reply brief says that MSD's counsel would have objected had there been any consideration that a request for information about all MSD projects used in Lyle's surgery included products other than the plate and infuse. The idea that you would not have been forthcoming, that you said at some point on page 32 somewhere that you would have objected had they asked for this information, which shows that you're... It's irrelevant. Why would that be irrelevant? Some device used in the surgery, why would that be irrelevant? Well, it's no different than the things that are used to put it in. It's no different. I don't know where he got that. He's quoting me as saying we would have objected? It says that, and it says that, in fact, it says that it would have been irrelevant, exactly what you just said, that you would have said it was irrelevant. And this is on page 3 of the reply brief. I'm not just making this up. What's the citation? The citation is MSD brief at page 34 and then page 32. So you would have objected to producing the DEC information? I thought you said you didn't produce it because you didn't know they were asking for it, but now you're saying you would have objected to it? No, I don't believe that's accurate. I wouldn't have any problem. If we were having a clean slate and he had all this problem, we would go through the case and we would still win summary judgment. These two things have nothing to do with the case. They didn't injure the person. They didn't cause the plate to break. I don't tell him how to put on his case. In retrospect, I'm sorry we didn't object. We should have objected on the same basis that Infuse was objected to, or we could have given it to him. It wouldn't have mattered. I don't know how to make it any clearer. I believe that it would have been good for them to have the materials. We could then have gotten into the fact that the FDA does not choose the way products are used. We could get into the fact that this is the practice of medicine used thousands and thousands of times, to this day, all over the country, and that there was another product that we made that was specifically, it looks the same. I have a picture of it. You wouldn't even be able to tell. It has a slight change in the dimensions, which is there, which he could have used. I don't know why he chose this. I suspect, but it's not in the record, that he had used it before and had success, and that's why he used it. That's the way doctors practice. I guess I'm out of time, and I hope I'm not. Well, I want you to have your full say. Pardon? You've said we've asked you a lot of questions. I don't want to omit any kind of relevant point that you would make that you haven't made, but I think you've made them all. Don't look for something to say. Well, I also wanted to call your attention to document three, which I gave, if I may, which is the e-mail which was sent to me by Lyle's counsel, and he sets forth, and you can look at it, some quibbles and complaints about our discovery responses, and at the end he says I'll be filing a motion to compel discovery if complete and good faith responses are not made by November 24th. We had a meet and confer. We spent 45 minutes on the phone. I started out by saying what do you need? What would you like from me? I gave him what he needed. I never heard from him again, not even one word, until the Rule 60B was mentioned. Okay. Lyle. I want to ask counsel this question, whether either one of you feel like you need to supply us with a letter that clarifies any problems that you may perceive have arisen in the course of this argument that you have not had adequate opportunity to either charge or to make responses to. Would you like to? Yes. Okay. And then within three days, file a letter with the clerk of the court, no longer than three pages, and then within five days you respond to it. And may we in our response also raise some points? If you raise points that he hasn't raised, he will have an opportunity to respond to them. But if you only address the points that he has made, there will be no reply to it. But if you understand what I'm saying. Would it be okay if we filed something simultaneously and then we could each? I believe there's a little bit of a misunderstanding here because of the entire context of the case, as if we were somehow knowing and holding back. The case went on for years. Okay. That may be a better idea is that each of you file simultaneous letter briefs of no more than three pages five days from the close of business today. Thank you, Your Honor. Okay. With the opportunity to respond, I get to file a response to the other ones? Well, I mean, if they're filed simultaneous, I suppose, simultaneous, and then after you receive the respective letter briefs from each other, you would have three days to respond to the other side. Okay? Thank you, Your Honor. Okay. And that will end it. Then we'll make our decision on that basis. Okay. We have a rebuttal. And whom are you representing? The plaintiff. I know, but are you representing? He's just splitting it. Okay. But he's on your side, right? It's not other parties involved in this. Okay. Go ahead. Your Honor, my name is Mike Renison representing Brian Liles. I apologize. That's okay. There's so many dishonesties that I just heard. Take your time. Okay. I'm ready. Mr. Levin mentioned to this Court that withheld documents that were And I'd just like to read a few passages from one of the withheld documents. There was not just one single withheld document. There were multiple documents that were discovered after this case was dismissed on summary judgment. The very first line of one of the withheld documents that is called important information on the vertistack spinal system, which was used on our client's cervical spine. The first sentence indicates, the vertistack spinal system is intended for vertebral replacement to aid in surgical connection of the stabilization of the spine. The system is indicated for single and two-level use only in the thoracic and lumbar anterior spine. Our client's vertistack was installed in his cervical spine. So already it's not being used in the correct location. It further states the vertistack spinal. What is this you're reading from now? This is a instruction that is apparently included with all vertistack devices for use to instruct physicians on how to properly. I assume this would have been available to the doctor who used it. It should have been available to the doctors, and we were not aware whether or not it was, because as Dr. Sin indicated in his discovery responses, he wasn't aware whether or not. No, I'm sorry. His direct response was, no, all devices used in Brian Lyle's surgery were used in the way they were designed and commonly used. He did not say that it was the way they were. However, Mr. Levin quoted it. So we don't know if he had it, and we don't know whether he would have used it anyway. We don't know one way or the other. But he may have used it because people use off-label uses for devices all the time. He may have used it for that purpose, regardless of its actual intended use. But based on his response to our discovery request, we know that he actually thought that this device was intended to be used in the cervical spine, that it was not just commonly used, but that it was designed. That is actually an excuse. Tell me, why did you all not, through due diligence, have this matter raised in a timely fashion? That's a good question, Your Honor. Discovery was provided to us on October 1st or September, late September. Objections were made to infuse. Explanations for lack of documents about the lot number for the Atlantis plate were provided in that discovery response. Nothing was provided at all about the VirtaStack. In addition, when we asked what devices were used in this surgery on May 10th, 2013, that were made by Medtronic, instead of saying a VirtaStack spinal system, which they have acknowledged within a week, was actually used, they identified three components called anatomic and long serial number. When we then went to say, I said, okay, well, I'm going to see what those are. I'll do my own due diligence and review what comes up on my own research with those device names, anatomic 6241, 62401. I put that in their website. Nothing came up. I found literally nothing. I put it on Google. I found nothing. So my belief was they've objected to the infused documentation. They've provided us Atlantis plate documentation to the extent that they can and explained why they can't provide the actual lot. Would you like to follow up with further interrogatories since their answers have been unsatisfactory? At that time, Your Honor, our belief was that their answer was satisfactory. I had no reason to believe. It could have been. It seems to me if you Googled it and went on their website and got no information from that particular serial number. Your Honor, I wasn't aware that there was any information to be had. I looked it up and I thought, well, if I can't find anything and they didn't produce it to me, I assumed that they were telling me the truth, that there was none. I was given these numbers. They weren't even coming up. In hindsight, perhaps I should have asked, but when I didn't get any discovery response regarding those devices and I could myself not find any documentation on those device pieces, not even devices, they're actually components, then I thought, well, maybe there is no literature on them. Maybe they're just parts like a screw or a nut and that there is no need to draft lengthy documents about it. I did not know that those three pieces were actually one device. And even if I had found a Virtustax spinal system in my... I mean, Your Honor, that's your duty to find out that those three pieces are one device, to know something about your case. Right. And efforts were made. I spent hours searching for this information. And the fact that, one, none of the documents were provided to us, and two, even if I had found a Virtustax spinal system on the Internet, I wouldn't have known that it was, in fact, the same device that was listed on the implant page, which was not even... I mean, the device wasn't even given to us. The name was not provided to us. It was described as three separate components. But did you make any objection to the court that the interrogatories are incomplete and are not providing us information that we requested? No, Your Honor. We did not. And the reason we did not was because we believed that at that time all the documentation that was responsive to our discovery requests had been provided to us. But you've told us that your search came up... I did. And my search came up with nothing. Well, okay. Thank you very much. You're welcome. That completes the cases that we have on the oral argument.